**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL ACTION** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **SHYHEEM WILLIAMS** | **:** | **NO. 22-418** |

**OPINION**

Slomsky, J.                                                                 October 11, 2023

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 2

II.   FINDINGS OF FACT ........................................................................... 5

   A.   Sidler Observes and Pursues the Impala ....................................... 5

   B.   Jastrzebski and Wesiolowski Pull Over the Impala ...................... 6

   C.   Sidler Arrives on the Scene ........................................................... 7

   D.   Sidler Decides to Remove Defendant From the Impala ................ 11

   E.   Defendant Is Removed from the Impala and Detained .................. 13

   F.   Officers Find a Firearm in the Impala ........................................... 15

III.  CONCLUSIONS OF LAW .................................................................... 16

   A.   Law Regarding a Traffic Stop ....................................................... 16

   B.   The Traffic Stop Was Not Measurably Extended .......................... 18

   C.   Officers Had a Reasonable Suspicion That Defendant Was Armed

      and Dangerous ............................................................................... 21

IV.   CONCLUSION ..................................................................................... 25

## I.      INTRODUCTION

Police officers investigate traffic violations.  In this case, officers were confronted with a car that had dark tinted windows, ran a red light, and did not stop in response to overhead lights from a police vehicle.   While investigating the traffic violations, police believed they had developed reasonable suspicion that the driver was armed and dangerous, necessitating a search of the area of the vehicle in the immediate control of the driver.  When they did so, officers found a firearm in the glove compartment and arrested the driver, who was on federal probation.  Under these circumstances, the prosecution submits the firearm was lawfully seized and may be used as evidence against the driver who was prohibited from possessing it because he had a felony conviction.

In this criminal case, the driver in the car was Defendant Shyheem Williams.  He is charged with unlawfully possessing a firearm while being a felon in violation of 18 U.S.C. § 922(g)(1). The charge arose on April 24, 2022 after Officer Taylor Sidler of the Philadelphia Police Department ("PPD"), driving eastbound, spotted a heavily-tinted silver Chevrolet Impala driving westbound away from a hotspot of shootings and narcotics activity.   Officer Sidler made a U-turn, activated his patrol car lights, and followed the Impala, which sped through a steady red light at a busy intersection in Philadelphia, Pennsylvania.  Because PPD protocols did not permit Officer Sidler to pursue the Impala through the red light, he radioed a description of the vehicle to other officers.

Shortly after, Officers Ray Jastrzebski and Cathy Wesiolowski identified and pulled over the vehicle.  Officers Bentley Woods and Paul Watson arrived on the scene during the traffic stop. Officer Sidler also arrived on the scene.  All officers were equipped with body-worn cameras that were activated during some or all of the traffic stop.  The driver, later identified as Defendant

Williams, was ordered out of the car, detained, and placed in the back of Officer Sidler's patrol car.  At the same time, the officers conducted a protective search of the passenger area of the Impala and found in the glovebox a 9-millimeter Glock 17 Gen 5 (the "firearm") loaded with thirty-two (32) rounds of live ammunition.  While Defendant was in the patrol car, he called over officers and told them that the firearm belonged to his girlfriend and that he knew the firearm was in the vehicle.  Later, at the police station, Defendant was read his Miranda rights and he gave officers nearly the same information he gave while in the back of Officer Sidler's patrol car.  On November 17, 2022, a grand jury indicted Defendant for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1).

Before the Court is Defendant's Motion to Suppress.  (Doc. No. 17.)  In the Motion, Defendant seeks to suppress both the firearm and his statements made on the scene and at the police station. [1]  (Id.)  In his Motion, Defendant argues that:  (1) the initial traffic stop was not justified at its inception; (2) the officers lacked reasonable suspicion to extend the scope of the traffic stop; and (3) the officers lacked reasonable suspicion to pat down his outer clothing and to search his vehicle.  (See id. at 10-19.)  Defendant also argues that the statements he made on the scene in Officer Sidler's patrol car and at the police station should be suppressed as the fruit of the unconstitutional traffic stop and search of his vehicle.  (Id. at 10, 19-22.)

The Government filed a Response in Opposition raising several arguments it submits support the lawfulness of the search of Defendant and his vehicle.  (Doc. No. 21.)  First, the

---

[1]  Defendant has withdrawn his argument that his statements made while in Officer Sidler's patrol car were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  (See Doc. Nos. 26 at 4; 39 at 1.)  Defendant maintains, however, that the statements he made while in the back of Officer Sidler's patrol car and at the police station during an interview with PPD Detectives should be suppressed as the fruit of the poisonous tree stemming from the unlawful search of the Chevrolet Impala.  (Doc. No. 39 at 1.)

Government argues that the traffic stop was based on reasonable suspicion that Defendant violated Pennsylvania traffic laws and that the officers' actions were properly within the scope of investigating the traffic violations.  (See id. at 8-13.)  Second, it asserts that the officers developed reasonable suspicion that Defendant was armed and dangerous during the investigation of the traffic stop and that they properly conducted a pat-down search of Defendant and a protective search of the vehicle.  (See id. at 13-17.)  Third, the Government claims that there was probable cause to search the vehicle.  (See id. at 17-20.)  Finally, the Government submits that the statements of Defendant in the patrol car and at the police station were not the fruits of an illegal search of Defendant's Impala because the Impala was legally searched.  (See id. at 20-23.)

On April 17, 2023, an evidentiary hearing was held on the Motion to Suppress.  During the hearing, four of the five police officers who were at the traffic stop—Officers Sidler, Jastrzebski, Woods, and Watson—testified.  (See Doc. No. 26.)  Their body-worn cameras were played during the hearing.  Following the hearing, the parties were instructed to meet and confer to transcribe the statements captured on the officers' body cameras.  (See Doc. No. 26 at 166.)  The parties also were instructed to file supplemental findings of fact and conclusions of law within forty-five (45) days after receipt of the transcript of the evidentiary hearing.  (See id. at 168.)

On August 1, 2023, Defendant filed a Supplemental Motion to Suppress Physical Evidence and Statements (Doc. No. 36),[2] and the Government filed its Proposed Findings of Fact and Conclusions of Law (Doc. No. 37).

---

[2]   Although Defendant titles it as a "Supplemental Motion," the Court ordered the parties to file "findings of fact and conclusions of law in support of or in opposition to the Motion to Suppress Physical Evidence and Statements." (Doc. No. 35.)  The "Supplemental Motion" (Doc. No. 36) therefore will be treated as containing findings of fact and conclusions of law in support of the Motion to Suppress.  (Doc. No. 17.)

Because the traffic stop was not measurably extended and there was reasonable suspicion that Defendant was armed and dangerous, the officers were justified in frisking him and the area of his vehicle within his arm's reach.  Accordingly, Defendant's Motion to Suppress (Doc. No. 17, 36) will be denied.

## II.    FINDINGS OF FACT

### A.  Sidler Observes and Pursues the Impala

The evidentiary hearing was held on April 17, 2023.  As noted, the Court heard testimony from Philadelphia Police Department ("PPD") Officers Taylor Sidler ("Officer Sidler"), Ray Jastrzebski ("Officer Jastrzebski"), Bentley Woods ("Officer Woods"), and Paul Watson ("Officer Watson"), and watched footage of the traffic stop captured on their body-worn cameras.[3]  The following facts were adduced at the hearing.

---

[3]   At the time of the traffic stop and arrest of Defendant, the officers had the following experience:

Officer Sidler was assigned to the 19th District, the District in which the events in this case took place, for five years.  (See Doc. No. 26 at 5, 22-23.)  He also was assigned to a tactical unit called the Five Squad.  (See id.)  As part of the Five Squad, he was assigned by a captain to a pinpoint grid.  (See id. at 6.)  A pinpoint grid is an area "where the most violent crimes are, robbery, shootings and narcotics sales."  (Id.)

Officer Sidler has experience with conducting traffic stops, interacting with individuals concealing illegal firearms during traffic stops, and recovering the firearms.  (See id.)  He also has experience with individuals fleeing or attempting to flee from traffic stops.  (See id.)  Before he was a PPD police officer, Officer Sidler was employed for about a year as a Correctional Officer at the State Correctional Institute in Schuylkill County, Pennsylvania ("SCI Schuylkill").  (See id. at 6-7.)

Officer Jastrzebski had been assigned to the 19th District for three years.  (See id. at 104.)  He conducts approximately five to ten traffic stops a week.  (See id. at 105.)

Officer Woods had been assigned to the 19th District for five years and was a member of the Five Squad for three years.  (See id. at 69.)  He has experience in conducting traffic stops and recovering illegal firearms and other contraband during the stops.  (See id.)  He also has experience with vehicles fleeing from traffic stops.  (See id.)

At around 5:00 p.m. on April 24, 2022, while Officer Sidler was driving eastbound in a marked patrol car on Vine Street near the 800 block of North 64th Street, he observed a heavily tinted, silver Chevrolet Impala driving westbound on Vine Street.  (See Doc. No. 26 at 7-8, 23.) Vine Street is a busy street.  (See id. at 24.)  When Officer Sidler observed the vehicle, it was a half-block away from 200 North Horton Street, a location known to 19th District officers for high levels of violent crime and narcotics sales.  (See id. at 8.)

Because the Impala was heavily tinted and driving away from Horton Street, Officer Sidler made a U-turn to get behind the vehicle in order to observe its license plate, but the vehicle was speeding.  (See id. at 9.)  While Officer Sidler pursued the Impala, he saw it hesitate at the light at the intersection of 63rd and Vine Streets and then drive through the light after it turned red.  (See id. at 9-10.)  Officer Sidler activated the lights on his patrol car to signal Defendant to pull over. (See id. at 28.)  Officer Sidler did not follow the Impala through the red light because PPD directives prohibit pursuit in heavily trafficked areas.  (See id. at 9-10.)  Instead, he relayed over police radio the vehicle's make, model, and direction of travel and that the vehicle "took off on" him and ran a red light.  (See id. at 10, 30.)[4]

### B.  Jastrzebski and Wesiolowski Pull Over the Impala

Officer Jastrzebski and his partner Officer Wesiolowski responded to Sidler's radio transmission.  They observed the Impala traveling northbound on 64th Street and decided to stop it.  (See id. at 10-11, 106.)  Officer Jastrzebski followed the Impala for about two blocks before

---

Officer Watson has been assigned to the 19th District for nine years and to the Five Squad for six years.  (See id. at 149.)

[4]  Although Officer Sidler testified on cross-examination that it is possible that Defendant did not see the lights on his patrol car, he also said that when he pursued the Impala, he saw it run a red light, ignore his patrol car's lights, and continue to travel away from him at a high rate of speed. (See Doc. No. 26 at 44.)

activating his lights and sirens to pull the vehicle over on 800 North 64th Street.  (See id. at 106.)
The driver of the Impala immediately pulled over.  (See id. at 115, 118.)

Officer Jastrzebski activated his body camera and approached the driver's side window
which was only slightly open.  (See id.)  The body camera footage shows that the Impala's brake
lights were on, meaning that the driver's foot was on the brake pad and the car was not placed in
park.  Officer Jastrzebski walked to the driver's side of the Impala and asked the driver if he "[c]an
roll the windows down for [him]."  (See id.; Doc. No. 41 at 2.)  The driver lowered the window,
but not all the way down.  (See Doc. No. 26 at 115.)  He then asked the driver for his driver's
license and vehicle registration which, along with his car insurance information, he already had in
his hands before Officer Jastrzebski's request.  (See id. at 116.)

After Officer Jastrzebski's took the driver's license, registration, and insurance
information, he walked back to his patrol car to run the driver's name and the Impala's license
plate through the PPD's computer system.  (See id. at 108.)  He performed this record check for
the officers' "safety to see if he had any warrants and to make sure that the driver's license is valid
. . . [a]nd . . . to make sure the car is valid with the registration and insurance."  (Id. at 109.)

**C.  Sidler Arrives on the Scene**

While Officer Jastrzebski was running the record search of Defendant, Officer Sidler
arrived on the scene and parked his patrol car behind Officer Jastrzebski's car.  (See id. at 11-12,
109, 119.)  As soon as he parked his car, Officer Sidler walked directly toward the Impala to
"identify [it] was the correct vehicle before [the officers] went any further . . . [a]nd [to make sure]
it wasn't a mistaken stop."  (Id. at 37.)  As Officer Sidler approached the Impala, he observed that
Defendant's brake lights were lit up, which indicated that the vehicle was not in park.  (Doc. No.
26 at 41.)   The following conversation took place:

OFFICER SIDLER:  What's going on, man?  You were just on Vine Street before?

MR. WILLIAMS:  I just came from work.

OFFICER SIDLER:  Where at?

MR. WILLIAMS:  (Inaudible).  Uhhh UHaul, I work at UHaul, 49th and (inaudible)[.]

OFFICER SIDLER:  Where's that at?

MR. WILLIAMS:  49th and Chestnut.

OFFICER SIDLER:  49th and Chestnut.  Okay.  You weren't on Vine Street at all, 6-2 and Vine, 6-2 and Vine?

MR. WILLIAMS:  I came up Vine.

OFFICER SIDLER:  So you were on Vine Street?

MR. WILLIAMS:  Yeah I was, I came from that way cause that's on my way home.

OFFICER SIDLER:  Okay.

MR. WILLIAMS:  I take (inaudible) 39th and Market--Come up Vine, make a right hand on 63rd.

OFFICER SIDLER:  Okay.  So when I turned around, that was you that took off and went through the red light?

MR. WILLIAMS:  No, I didn't go through no red light.  Was it a Jeep that was in front of me?

OFFICER SIDLER:  I'm not sure.  The light was red.

MR. WILLIAMS:  Oh, no, I didn't --

OFFICER SIDLER:  And I was attempting to stop you, and you --

MR. WILLIAMS:  No, I didn't run--

OFFICER SIDLER:  -- went through the light.

MR. WILLIAMS:  No, I didn't run through no red light.  Are you talking about on 63rd Street?

OFFICER SIDLER:  Correct.

MR. WILLIAMS:  No.  It was a yellow light.  The Jeep behind me stopped in front of me--

OFFICER SIDLER:  It was red.  I had my lights on behind you.  Man, it was red. You got anything in this vehicle I need to know about?

MR. WILLIAMS:  No.

OFFICER SIDLER:  License to carry?  Anything like that?

MR. WILLIAMS:  I don't have anything I'm on federal probation.

OFFICER SIDLER:  Federal probation.

MR. WILLIAMS:  Oh yeah I'm just getting off of work.

(Doc. No. 42 at 2-3.)  While they discussed where Defendant was coming from, Officer Sidler observed that Defendant's demeanor appeared normal. But once Defendant told Officer Sidler that he was on federal probation, Officer Sidler noticed that Defendant was breathing heavy and appeared to be nervous.

Officer Sidler testified that Defendant was "giving [him] deceptive answers based off where he was coming from." (Doc. No. 26 at 43.)  They were deceptive because Officer Sidler believed that Defendant must have seen him while driving on Vine Street because they "passed each other head on." (Id. at 44.)  When Officer Sidler asked Defendant if he had anything in the Impala that he needed to know about, Officer Sidler observed Defendant's chest and stomach begin to rise and fall very quickly.  (Id. at 14.)  At that point, Defendant broke eye contact with Officer Sidler and began grabbing at his shirt.  (Id.)

In an attempt to establish rapport with Defendant and make him feel more comfortable, Officer Sidler then asked Defendant where he had been incarcerated.[5]  (See Doc. No. 26 at 15.) Defendant told him he was imprisoned at the Federal Correctional Institution in McKean County, Pennsylvania ("FCI McKean"), and Officer Sidler told Defendant he used to work at the Federal Correctional Institution in Schuylkill County, Pennsylvania ("FCI Schuylkill").  (See id. at 15; Doc. No. 42 at 3.)  Officer Sidler talked about his experience as a Correctional Officer at FCI Schuylkill.  During this exchange, Sidler noticed Defendant's heart and breathing rate lower.  (See id.)  He maintained eye contact with Officer Sidler.  (See id.)

Officer Sidler knew that because Defendant was on federal probation, he was prohibited from possessing a firearm or a license to carry a firearm.  (See id. at 15.)  The conversation between Officer Sidler and Defendant continued:

> OFFICER SIDLER:  So nothing illegal in the car, man?
>
> MR. WILLIAMS:  No.
>
> OFFICER SIDLER:  There's no weapons in this car?
>
> MR. WILLIAMS: No, man.  I don't have anything I just got off work.  That's what I'm sayin['] man.  I just getting off work.
> OFFICER SIDLER: Okay.  All right.  You won't mind if we check?
>
> MR. WILLIAMS:  No.
>
> OFFICER SIDLER:  You don't mind?
>
> MR. WILLIAMS:  No, no.  You don't have a warrant.
>
> OFFICER SIDLER:  All right.  I don't really need a warrant.

---

[5] Officer Sidler testified that he asked Defendant about something unrelated to firearms in order to observe whether Defendant's behavior changed when the topic of firearms was reintroduced. He stated his questioning was an "attempt to establish repour and to bring [Defendant's] baseline back to normal to see if his reactions to the firearm questions were something that [Officer Sidler] should pay attention to . . ." (Doc. No. 26 at 15.)

MR. WILLIAMS:  I don't have anything.  (Inaudible).

(Doc. No. 42 at 4.)  When he asked Defendant about whether there were any weapons in the vehicle, Officer Sidler saw that Defendant again began breathing rapidly and grabbing his U-Haul shirt.  (See Doc. No. 26 at 14-15.)  Officer Sidler also noticed that whenever he asked about a firearm, Defendant broke his eye contact and "looked towards either the passenger side floor or the glove compartment area."  (Id.)  He knew Defendant's heart rate was increased because "[y]ou could see it through his shirt.  You can see the pounding of his chest and the fast rising of his stomach."  (Id. at 15-16.)  Officer Sidler testified that at this point he believed that he had a reasonable suspicion to believe that Defendant was armed and dangerous based on Defendant's "behaviors and the totality of the circumstances and [their] interaction."[6]  (Id. at 17.)

At some point during Officer Sidler and Defendant's conversation, Officer Bentley Woods arrived on the scene with his partner Officer Paul Watson.  (See id. at 17, 70.)  Both officers approached the driver's side of the Impala.  (See id. at 81, 158.)  At that point, Officer Sidler walked back to Officer Jastrzebski's patrol car.  (See id. at 17, 109-10.)  Officer Woods, who remained at the vehicle, testified that Defendant appeared to be very nervous and that Defendant kept telling him that he was coming from work while pointing to his U-Haul shirt and attempting to look for his work ID badge.  (See id. at 72, 82.)

### D.  Sidler Decides to Remove Defendant From the Impala

At Officer Jastrzebski's patrol car, Officer Sidler described to Officers Wesiolowsi and Jastrzebski his conversation with Defendant and stated that he was going to remove him from the vehicle.  (Id. at 17.)  At this moment, Officer Jastrzebski finished his record check and ascertained

---

[6]  Officer Sidler also testified at the evidentiary hearing that "[i]f no firearm was found [the defendant] would be placed back in the vehicle."  (Doc. No. 26 at 17.)

that Defendant's driver's license, vehicle registration, and proof of insurance all were valid and that he had no outstanding arrest warrants.  The record check confirmed that Defendant was on federal probation.  (See id. at 119-20.)  Officer Jastrzebski was conducting his record search on Defendant while Officer Sidler was talking to Defendant.  (See id. at 109, 120.)  The following conversation was recorded by Officer Jastrzebski's body camera while at Officer Jastrzebski's patrol car:

> OFFICER JASTRZEBSKI:  I don't know.  Is that it?  Is that it or no?  It's older than that?
>
> OFFICER SIDLER:  Yeah, that's, that's the car.
>
> OFFICER [JASTRZEBSKI]:  It is?
>
> OFFICER SIDLER:  He said it was, yeah.  He said -- he tried to say he didn't go through the light.  But since I put the lights on, he went right through the . . . red light.
>
> OFFICER [JASTRZEBSKI]:  Why did he take off on you, though?
>
> OFFICER SIDLER:  Huh?
>
> OFFICER [JASTRZEBSKI]:  Why did he take --
>
> OFFICER SIDLER:  He's on federal probation.  I know that.  And his . . . chest is pounding.
>
> OFFICER [JASTRZEBSKI]:  Okay.
>
> OFFICER [WESIOLOWSKI]:  Did you see how he's sitting?
>
> OFFICER SIDLER:  Yeah.
>
> OFFICER [WESIOLOWSKI]:  He's like angled.
>
> OFFICER SIDLER:  Yeah, I'm taking  --he's coming out.
>
> OFFICER [WESIOLOWSKI]:  He doesn't want you to close that door.
>
> OFFICER [JASTRZEBSKI]:  Yeah.  Oh you got all this info already?

OFFICER SIDLER:  I don't know his name or nothing.  All right.  I'm taking him out.

(Doc. No. 41 at 2.)  Officer Sidler testified that Officer Wesiolowski believed that Defendant's angle in the seat indicated that there was a gun in the driver's side door.  (<u>See</u> Doc. No. 26 at 47.)

### E.  Defendant Is Removed from the Impala and Detained

Officers Sidler and Jastrzebski then returned to the Impala and approached it from the driver's side.  (<u>See</u> <u>id.</u> at 17, 49, 73, 110, 120.)  Officer Sidler asked Officer Woods to remove Defendant from his vehicle.  (<u>See</u> <u>id.</u>)  Officer Wesiolowski also approached the Impala from the passenger side.  (<u>See</u> <u>id.</u> at 110.)  Officer Sidler told Defendant to step out of the car.  (Doc. No. 44 at 2.) Defendant replied:  "Oh, my God.  I'm not doing nothing.  I'm not doing nothing.  What y'all got me for?  I'm not doing nothing."  (<u>Id.</u>)  Officer Sidler had his hand on Defendant's left arm and attempted to pull him out of the car.  (Doc. No. 26 at 57.)  Officer Sidler testified that Defendant was "[p]assive aggressive" but offered minimal resistance while being removed from his vehicle.  (<u>See</u> <u>id.</u> at 18-19, 55.)  After Defendant was removed from the Impala, it started to roll forward.  (<u>See</u> <u>id.</u> at 18.)  Officer Sidler entered the driver's seat to stop it and put it in park.[7] (Doc. No. 42 at 5.)

Upon reviewing body camera footage of Defendant's removal from the car, Officer Jastrzebski testified that when he saw Defendant turn his head toward the center console "real quick," he thought Defendant was putting the gear shift into drive.  (<u>See</u> Doc. No. 26 at 144.)  The body camera footage recorded Officers Sidler, Jastrzebski, Wesiolowski, and Watson all state that

---

[7]  Officer Sidler's body camera showed Defendant's foot was on the brake pad, that he never put the car in drive before officers attempted to remove him from the vehicle, and that he also reached for a phone with his right hand.  (<u>See</u> Doc. No. 26 at 41-42, 49-52.)  Officer Sidler testified that at the time of stop, he believed that when Defendant reached for his phone he was actually putting the car in drive.  (<u>See</u> <u>id.</u> at 54.)

they saw Defendant try to drive away to avoid being detained.  (See Doc. No. 42 at 9, 11-12.)  This comports with Officers Sidler and Jastrzebski's testimony during the evidentiary hearing and information they provided to a detective who interviewed them hours after the traffic stop.[8]  (See Doc. Nos. 26 at 54, 126, 128; 36-1 at 2, 6.)

Officer Sidler testified that Defendant was not a threat to them but was "refusing [the officers'] commands and not complying with orders," except for Defendant's compliance with his command that he get against his car.  (Id. at 19, 55-56.)  The other instances that Officer Sidler said demonstrated Defendant's refusal to obey his commands were when Defendant was "arguing and asking why [did he] have to get out."  (Id. at 57.)  Officer Woods said Defendant was resisting because he had to be asked multiple times to get out of the Impala.  (Id. at 89.)  Additionally, Officer Sidler testified that another time Defendant failed to obey a command was when Defendant initially failed to pull over after he had driven through the red light at the intersection of 63rd and Vine Street.  (See id. at 19.)

Defendant was handcuffed.  Officer Watson then frisked him and felt what he knew was a "plastic attachment with a key on it."  (Id. at 92, 160.)  Officer Sidler also took part in the frisk and found a large sum of cash in Defendant's pocket.  (See id. at 60.)  Officers Woods and Watson escorted Defendant away from his vehicle and toward a patrol car.  (See id. at 77, 94.)  While Defendant was being escorted, he looked back toward his car several times.  (See id. at 77.)  Based on Officer Woods experience as a police officer, he believed that Defendant looked back at the car because he "wanted to see where [the officers] were looking, just hoping that [they] didn't

---

[8]  Officer Wesiolowski did not testify at the evidentiary hearing.  Officers Woods and Watson did testify and they were not asked any questions on direct, cross, redirect, or recross-examination about whether they believed Defendant put the Impala in drive or stepped on the accelerator.

find what he's looking for." (See id. at 101.)  Officers Woods and Watson then placed Defendant
in the patrol car.  (See id. at 78.)

### F.  Officers Find a Firearm in the Impala

After Defendant was detained, Officer Sidler started his "frisk" of the Impala at the driver's
side and Officer Jastrzebski started his "frisk" at the passenger's side.  (See id. at 20.)  Officer
Sidler "[c]hecked under the seat and in the areas that were in his immediate control and reach.
[These areas included] [i]nside the glove compartment or the center console, in the door, under the
seat and at that point Officer [Jastrzebski] located a firearm so [they] stopped." (Id. at 20-21.)  The
following dialogue was captured by Officer Sidler's body camera footage:

> OFFICER SIDLER:  19 Tac 3, we got a gun recovered out here.
> . . .
> OFFICER SIDLER:  Nah it's in the glove box.
>
> OFFICER SIDLER:  Good job.
>
> OFFICER [JASTRZEBSKI]:  Good job.  He almost ran us over.
>
> OFFICER WATSON:  Is that the car too?
>
> OFFICER SILDER:  That's the car, yeah.  He admitted to it.
>
> OFFICER [JASTRZEBSKI]:  Perfect job.  Then he tried taking off again.

(Doc. No. 42 at 7-8.)

After the firearm was recovered, Officer Watson told Defendant and Defendant said:
"There's a what in the car?" (Doc. No. 42 at 2.)  Officer Watson walked away from the patrol car
until Defendant called him over again. (See Doc. No. 26 at 155.)  Defendant then appeared to ask
Officer Watson to turn off his body camera and said that he "know[s] a bunch of stuff, which y'all
might want to know" and asked if they would release him if he "verif[ied] stuff" and went "to
court and testif[ied]." (Doc. No. 43 at 6.)

After this conversation, Officer Woods approached Defendant and Officer Watson walked away from him.  Defendant told him a different story than he told Officer Watson:  "It's my ex-girlfriend, right.  We had an argument.  We had an argument the other night.  And whatever, she was in my car.  And I took it from her.  I put it in there."  (Doc. No. 44 at 9.)  Defendant also told Officer Woods that he wanted to be released and that he would testify about "whatever [they] want to know about what's going on, whatever [he] know[s]."  (Id.)  None of the officers instituted questioning.  Officer Sidler escorted Defendant to the 19th District for processing.  (See Doc. No. 26 at 21.)  During the drive, Defendant said that he "might have taken the light" at the intersection of 63rd and Vine Streets and that he cannot go back to prison.  (Id. at 21-22.)

## III.   CONCLUSIONS OF LAW

### A.  Law Regarding a Traffic Stop

Defendant contends the officers impermissibly extended the traffic stop[9] and lacked reasonable suspicion to frisk him or extend their frisk to the Impala because there was no direct information or even an indication that he was armed and dangerous.  Regarding the legality of traffic stops, the Third Circuit Court of Appeals has explained:

---

[9]   The United States Supreme Court has "established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."  United States v. Wilson, 960 F.3d 136, 145 (3d Cir. 2020) (quoting United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) (citing Whren v. United States, 517 U.S. 806 (1996))).  "[A] traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop."  United States v. Delfin-Colina, 464 F.3d 392, 398 (3d Cir. 2006).  At a minimum, the "officer [must] have observed a traffic violation prior to initiating the traffic stop."  United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012).  Here, the parties do not dispute that Defendant's tinted windows were a violation of Pennsylvania motor laws.  See 75 Pa. C.S. § 4524(e)(1).  In addition, Officer Sidler observed Defendant drive through a red light.  See 75 Pa. C.S. § 3112(a)(3).  Accordingly, the traffic stop of Defendant's vehicle was lawful.

16

A traffic stop, even if brief and for a limited purpose, "constitutes a seizure of persons within the meaning of [the Fourth Amendment]." Whren, 517 U.S. 806, 809-10 (1996). Though a stop may be lawful at its inception (as the parties agree is the case here), it could become "unreasonable," and thus violate the Constitution's proscription, at some later time." Illinois v. Caballes, 543 U.S. 405, 407 (2005). . . .

The Supreme Court in Rodriguez directs our attention to the mission of the traffic stop to determine whether it is impermissibly lengthened.  Rodriguez v. United States, 135 S. Ct. [1609,] 1614-16 [(2015)].  A stop becomes unlawful when it "last[s] . . . longer than is necessary" to complete its mission, the rationale being that the "[a]uthority for the seizure . . . ends when tasks tied to the [mission] are[,] or reasonably should have been[,] completed." Id. at 1614.  To prolong a stop beyond that point, the officer must have acquired reasonable suspicion during the mission to justify further investigation.  Id. at 1615.  There is no de minimis exception to this rule.  Id. at 1616.

United States v. Clark, 902 F.3d 404, 409-10 (3d Cir. 2018).  The United States Supreme Court has held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009).

"When reviewing an allegation that a traffic stop started out properly but later was improperly extended, we 'look[] to the facts and circumstances confronting [the officer] to determine whether his or her actions during the stop were reasonable.'" United States v. Hurtt, 31 F.4th 152, 159 (3d Cir. 2022) (quoting Clark, 902 F.3d at 409).

Courts use a two-stage inquiry to determine whether a traffic stop was unreasonably extended to investigate other crimes.  As the Third Circuit in Hurtt observed:

The required inquiry proceeds in two stages:  "we must first determine [if and] when the stop was 'measurably extend[ed]'"; and second, "[a]fter determining when the stop was extended—the 'Rodriguez moment,' so to speak—we can assess whether the facts available . . . at that time were sufficient to establish reasonable suspicion.'" After the Rodriguez moment, "nothing later in the stop can inform our reasonable suspicion analysis."  In short, we ask whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a

reasonable suspicion of criminality.  Any break in that mission taints the stop because it is the result of an unreasonable delay.

Hurtt, 31 F.4th at 159.  "The lawful seizure 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'"  Garner, 961 F.3d at 269-70 (quoting Rodriguez, 575 U.S. at 354).

Here, however, for reasons described below, the traffic stop was not measurably extended and the decision to remove Defendant from the Impala, frisk him, and search the area of the car within his immediate reach was supported by reasonable suspicion that he was armed and dangerous or he could gain access to a weapon if permitted to return to his vehicle.  Therefore, the officers did not violate Defendant's Fourth Amendment rights when it found a firearm in Defendant's glovebox, seized it, and arrested him.

### B.  The Traffic Stop Was Not Measurably Extended

"[A] traffic stop's mission is 'to address the traffic violation that warranted the stop and attend to related safety concerns.'"  Clark, 902 F.3d at 410 (quoting Rodriguez, 575 U.S. at 354).  Tasks tied to the traffic stop's mission include:  "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  Garner, 961 F.3d at 271 (internal quotation marks omitted) (quoting Rodriguez, 575 U.S. at 355).  Although "[n]ot all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission," Clark, 902 F.3d at 410, "unrelated investigations that do not lengthen a roadside detention" do not violate the Fourth Amendment.  Garner, 961 F.3d at 269 (citing Arizona, 555 U.S. at 333).

Officer Jestrebski pulled over the Impala because it matched Officer Sidler's flash description of the vehicle he said ran a red light.  Officer Jestrebski obtained from Defendant his driver's license, vehicle registration, and proof of insurance.  Officer Jestrebski then went back to

his patrol car to verify Defendant's identity and perform a record search for the officers' "safety to see if he had any warrants and to make sure that the driver's license is valid . . . [a]nd . . . to make sure the car is valid with the registration and insurance." (Doc. No. 26 at 109.) All of these actions were to address Defendant's traffic violation.  When Officer Sidler arrived on the scene, Officer Jestrebski was still running Defendant's name and vehicle through his police computer.

Officer Sidler questioned Defendant who was seated in the Impala while Officer Jastrebski conducted the record search of him.  Officer Sidler's initial questions to Defendant were to determine whether he was on Vine Street to confirm the identity of the vehicle he believed he saw run a red light.  During Officer Sidler's questioning, Defendant at times failed to maintain eye contact, was breathing heavily, and appeared to be nervous.  In particular, when Officer Sidler asked Defendant if there were weapons in the Impala, Defendant began breathing rapidly and breaking eye contact to look towards the passenger side door or glove compartment area of the Impala. Moreover, Defendant did not put the vehicle in park.  Sidler noticed this because the break lights were on.  Sidler also believed that Defendant's answers to his questions were deceptive.

This situation is somewhat comparable to the facts in United States v. Ross, 2022 WL 16963247 (E.D. Pa.)  In Ross, the defendant was pulled over by two police officers for having illegally tinted windows.  Id. at *1.  They ran a record check of his license plate to confirm his identity and then approached his vehicle.  See id.  Upon request, the defendant produced proof and insurance and vehicle registration cards, both of which were expired.  See id.  The officers asked for his driver's license and the defendant claimed to have left it at his house.  See id.  Both officers observed the defendant's hands shake, his voice stammer, and his lips quiver.  See id.  They also noticed he was breathing heavily and was not making eye contact with them.  See id.  One of the officers engaged in "small talk" with the defendant in order to "calm [him] down" and "find a

common ground of conversation." Id.  The officers also observed him pick up his jacket and place it on the center console.  See id. at *2.

One of the officers returned to the patrol car to determine whether the defendant had a valid driver's license.  See id.  While the record search was underway, the officer who remained by the car observed the defendant continue to avoid eye contact, "shake, stammer, and breathe heavily." Id.  In addition, the defendant continued to reach around the center console which led to the officer asking him to keep his hands on the steering wheel.  See id.  The officer at the vehicle signaled to the officer conducting the record check to come to the vehicle because the former "felt uncomfortable, could not see where [the defendant] was reaching, and had concluded that they needed to remove [him] from the vehicle for safety reasons."  Id.  The officer conducting the record search returned to the vehicle to ask if the defendant had any firearms or drugs in his car, the defendant "kind of giggled and said no," and he still "appear[ed] very nervous."  Id.  After backup officers arrived, the decision was made to remove the defendant and frisk him and the front area of his vehicle.  See id.  The officers found money in the defendant's pocket and also found a firearm and heroin in the center console.  See id.

The court in Ross stated that the officers did not measurably extend the traffic stop during the record search of the defendant and the processing of the tint violation.  See id. at *4. Specifically, the court stated:

> Once [the officers] were conducting the legal traffic stop, they acted consistent with the Fourth Amendment in asking [the defendant] to produce necessary paperwork (a driver's license, proof of insurance, proof of registration) in order to process the ticket for the tint violation.  Upon [the defendant's] failure to produce a driver's license, the officers were justified in running records checks to confirm his identity and determine whether or not he had a valid license to drive.  [The defendant's] continued detention, while the officers took necessary steps to confirm his identity and that he had a driver's license, was a necessary part of the traffic stop and did not trigger any concerns, including a 'Rodriguez moment,' under the Fourth Amendment.

> The relevant constitutional moment of analysis is the point at which [the officers] decided to frisk [the defendant] and the front area of his vehicle, not as part of the traffic stop, but out of concern for their safety.  Rodriguez, 575 U.S. at 356.

Id. at *4.  Because the court ultimately concluded that the officers had reasonable suspicion to frisk the defendant and his vehicle, it denied the defendant's motion to suppress.  Id. at **4-5.

Here, as in Ross, while the record search of Defendant was underway, Officer Sidler remained by the Impala.  The record search conducted by Officer Jastrebski was a necessary step in confirming Defendant's identity and ensuring the officers' safety.  Officer Sidler approached Defendant's car while the record search was still ongoing in order to confirm that the Impala was the vehicle that he observed on 63rd and Vine Street, which was an act consistent with the investigation of the traffic stop violation.  At this time, Officer Sidler learned that Defendant was on federal probation and observed his suspicious behavior.  He also knew the car was not placed in park.  Officer Sidler's questioning as the record search was ongoing did not measurably extend the traffic stop.  For all these reasons and those described infra, reasonable suspicion that Defendant was armed and dangerous arose while the traffic stop was being investigated.  Thus, there was no Rodriguez moment.  The only question that requires further analysis is whether the facts show there was truly reasonable suspicion to frisk Defendant and conduct a protective search of the area in his car within his immediate reach.

### C. Officers Had a Reasonable Suspicion That Defendant Was Armed and Dangerous

Reasonable suspicion is "less than proof of wrongdoing by a preponderance of the evidence [and] . . . less demanding than that for probable cause."  Id. (internal quotation marks omitted) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).  In Arizona v. Johnson, the Supreme Court held that:

21

> To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

555 U.S. 323, 327 (2009); see also Verdier v. Borough, 796 F. Supp. 2d 606, 627 (holding that police must have reasonable suspicion that suspect is armed and dangerous in order to conduct a protective frisk under Terry) (citing Johnson, 555 U.S. at 327).

Such a frisk "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (quoting Terry, 392 U.S. at 26). An officer is justified in suspecting that an individual is armed and dangerous if he or she is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Mooresfield, 111 F.3d 10, 13 (3d Cir. 1997) (quoting Terry, 392 U.S. at 21). The Supreme Court also has held that "[w]here no arrest is made, . . . officers may search the car if they reasonably believe 'the suspect is dangerous and . . . may gain immediate control of weapons.'" Arizona v. Gant, 556 U.S. 332, 352 (2009) (quoting Michigan v. Long, 463 U.S. 1032, 1049 (1983)). "In the no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." Id.

In determining whether a suspect is likely to be armed and dangerous, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Courts "give considerable deference to police officers' determinations of reasonable suspicion." United States v. Brown, 765 F.3d 278, 290 (3d Cir. 2014) (internal quotations omitted)

(quoting United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006)).  In assessing whether there was reasonable suspicion to justify extending a traffic stop here, the collective knowledge of the officers on the scene will be imputed to each other.  See United States v. Whitfield, 634 F.3d 741, 745-46 (3d Cir. 2010).

To determine whether the officers here had reasonable suspicion to conduct a Terry frisk of Defendant and his car, the Court will assess the totality of the circumstances.  See Sokolow, 490 U.S. at 8.  Moreover, a court's reasonable suspicion analysis is informed only by the facts available at the time of the traffic stop, not facts established after the stop or subsequent arrest concluded.  See Hurtt, 31 F.4th at 159 (holding that "nothing later in the stop can inform our reasonable suspicion analysis") (citing United States v. Green, 897 F.3d 173, 182 (3d Cir. 2018)).

Here, there was reasonable suspicion that Defendant was armed and dangerous.  Initially, Officer Sidler observed the Impala with illegally tinted windows, attempted to pursue it, and saw it speeding away from him and run a red light.[10]  When Officer Sidler arrived on the scene after Officers Jastrzebski and Wesiolowski pulled Defendant over, he went to talk to Defendant to confirm that he was driving the same car he saw run a red light.  As Officer Sidler approached the Impala, he observed that its break lights were on, which indicated that the vehicle was not in park.  Officer Sidler began questioning Defendant about where he was traveling from.  At this time, Defendant's demeanor was normal.  Officer Sidler then changed his line of questioning to whether Defendant had a license to carry, Defendant said no and informed Officer Sidler he was on federal

---

[10] "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of means rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."  United States v. Laville, 480 F.3d 187, 195 (3d Cir. 2007) (internal quotation marks omitted) (quoting Sibron v. New York, 392 U.S. 40, 66-67 (1968)).

probation.[11]   At this point, Officer Sidler observed Defendant's chest and stomach begin to rise and fall quickly, he began grabbing at his shirt, and he broke eye contact. Officer Sidler then changed his line of questioning to something other than firearms to monitor Defendant's behavior. At that point, Defendant's heart rate and breathing lowered and he maintained eye contact with Officer Sidler.

When Officer Sidler returned to the topic of firearms and asked Defendant if there were any weapons in his vehicle, Officer Sidler noticed that Defendant's heart rate and breathing again rapidly increased and he broke eye contact with him to look toward the passenger side of the Impala.[12]   Officer Woods also observed that Defendant appeared to be very nervous.[13]   At this point, given the totality of the officers' observations, the officers believed they had reasonable suspicion and decided to remove Defendant from the Impala for safety reasons and to frisk him

---

[11]  A criminal record "is a valid factor" in a court's reasonable suspicion analysis.  See Green, 897 F.3d at 187 (citing United States v. Mathurin, 561 F.3d 170, 177 (3d Cir. 2009)).  "[A]s [the Third Circuit has] previously noted, 'the use of prior arrests and convictions to aid in establishing probable cause is not only permissible, but is often helpful.'"  Id. (quoting United States v. Conley, 4 F.3d 1200, 1207 (3d Cir. 1993)).  Both Officers Sidler and Jastrzebski learned prior to removing Defendant from his vehicle that he was on federal probation.

[12]  "Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citations omitted).  In addition, "Headlong flight -- wherever it occurs -- is the consummate act of evasion:  It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  Id.

[13]  Although Defendant showed Officers Sidler and Woods his U-Haul shirt to convince them that he worked at U-Haul and only was going home from work, Defendant's nervous behavior observed by the officers nonetheless is relevant to whether they had a reasonable suspicion that he was armed and dangerous.  See United States v. Lewis, 672 F.3d 232, 240 n.8 (3d Cir. 2012) ("[R]easonable suspicion may be based on acts capable of innocent explanation.") (quoting Whitfield, 634 F.3d at 744).

and his vehicle to search for a firearm on his person or in the area inside the Impala within his immediate reach.[14]

Given all the actions of Defendant and based also on the training and experience of the police officers, Officer Sidler and his team of officers had reasonable suspicion to believe that Defendant was armed and dangerous. Thus, the totality of the facts and circumstances known to the officers at the time they decided to remove Defendant from his vehicle gave rise to reasonable suspicion to frisk Defendant and to conduct a protective search of the area of his vehicle within his immediate reach. As a result of the protective search, a firearm was found in the glove box and seized by the officers.[15] Thus, the officers did not violate Defendant's Fourth Amendment rights when they seized the firearm from his glovebox. In addition, the statements made by Defendant in the patrol car and at the police station are not fruit of the search and seizure of the firearm in the Impala. Moreover, because reasonable suspicion was present, there is no need to decide whether the facts here also amounted to probable cause.

## IV.   CONCLUSION

For all of the foregoing reasons, Defendant's Motions to Suppress (Doc. No. 17, 36) will be denied. An appropriate Order follows.

---

[14]   As noted above, in Ross, the court found the officers' observations gave rise to a reasonable suspicion that the defendant was armed and dangerous. There, the court stated that such factors included the defendant's "extreme nervous behavior upon their initial encounter with him, including . . . that he was not making eye contact with the officers." Ross, 2022 WL 16963247, at *4. The court also noted that the officers' "personal experiences with vehicle stops in which individuals concealed contraband, including firearms . . . can be indicative of concealment of contraband." Ross, 2022 WL 16963247, at *5.

[15] The officers knew that Defendant, a felon on federal probation, was prohibited from possessing or carrying a firearm. See 18 U.S.C. § 922(g)(1).